# UNITED STATES DISTRICT COURT
## for the
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **CELESTA SCOTT,**<br>Individually and as<br>**ADMINISTRATOR OF**<br>**THE ESTATE OF**<br>**CHASTON PAUL TALLEY**<br><br>Plaintiff(s)<br><br>v.<br><br>**GEORGIA DEPARTMENT**<br>**OF PUBLIC SAFETY**,<br>a State Agency of the State of<br>Georgia, **COLONEL CHRIS WRIGHT**,<br>in his official capacity, **LT. CHARLES**<br>**CHAPEAU**, in his official capacity, and<br>**TFC DAVID KRAELING**, in his official<br>capacity<br><br>Defendant(s) | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action File No.<br>**JURY TRIAL DEMANDED** |

## COMPLAINT

**COMES NOW** Celesta Scott, by and through her undersigned counsel of record and hereby files this amended Complaint for Money Damages arising from Defendants' unlawful use of excessive force against Chaston Paul Talley, on June 4, 2022, resulting in the death of Mr. Talley on August 6, 2022.

## INTRODUCTION

1.

Plaintiff brings this civil action seeking damages pursuant to 42 U.S.C. § 1983 for Defendants violations of Plaintiffs' federal rights as guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution and for wrongful death and violations of Georgia law and the Georgia Tort Claims Act.

## JURISDICTION AND VENUE

2.

This court has jurisdiction over federal questions pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. § 1983, § 1988.

3.

Venue is proper in this court under 28 U.S.C. 1391 (b) because all incidents' events, and occurrences giving rise to this action occurred in the Northern District of Georgia.

## PARTIES

4.

Plaintiff Celesta Scott is the mother and Administrator of the estate of her deceased son, Chaston Paul Talley.

5.

Plaintiff resides in the Northern District of Georgia.

6.

At all times material hereto, Defendant Georgia Department of Public Safety (GDPS) was an agency of the State of Georgia which oversees the day-to-day operations of the Georgia State Patrol and other state law enforcement functions and was the employer of Defendants Colonel Chris Wright, Lt. Charles Chapeau and TFC David Kraeling. The Department can be served at 200 Piedmont Ave SE, #1804 W, Atlanta, Georgia 30334.

7.

At all times material hereto, Defendant Colonel Chris Wright was acting under color of law as a law enforcement officer and the Commissioner of the Department of Public Safety, Commander of the Georgia State Patrol and was the co- founder of the GDPS's Crime Suppression Unit and supervised the operations of the GDPS, the Georgia State Patrol, and the Crime Suppression Unit. Colonel Wright can be served at 959 United Avenue SE, Atlanta, Georgia 30316.

8.

At all times material hereto, Defendant Lt. Charles Chapeau was acting under color of state law as a law enforcement officer and lieutenant with the Georgia State Patrol, and a supervisor of the Georgia Public Safety Crime Suppression Unit. Not only was Lt. Chapeau a supervisor, but he was also an

active participant in GDPS Crime Suppression Unit's pursuit of Chaston Paul Talley. He can be served at 959 United Avenue SE, Atlanta, Georgia 30316.

9.

At all times material hereto, Defendant Trooper First Class (TFC) David Kraeling was a law enforcement officer acting under color of law, employed by the GDPS, served on the Georgia State Patrol's Drug Interdiction Unit, and was assigned to the GDPS Crime Suppression Unit. He can be served at 959 United Avenue SE, Atlanta, Georgia 30316.

10.

Plaintiff provided timely notice of her claims to the State of Georgia on or about May 30, 2023.

11.

Attached hereto as Exhibit "A" are the ante litem notices provided to the State of Georgia.

12.

Attached hereto as Exhibit "B" is proof of receipt by the State of Georgia.

## FACTUAL ALLEGATIONS

13.

On June 4, 2022, Plaintiff Chaston Paul Talley, while driving a dirt bike alone, through the streets of Atlanta, Fulton County, Dekalb County, and the State of Georgia, was pursued by law enforcement vehicles and members of the GDPS Crime Suppression Unit and was intentionally rammed into by the driver's side of TFC David Kraeling's State police vehicle.

14.

At all material times, TFC Kraeling was a member of the Georgia State Patrol Drug Interdiction Unit and classified as a Canine Officer. On June 4, 2022, he was a member of the GDPS Crime Suppression Unit.

15.

At no time during the malicious intentional use of unreasonable deadly force by Kraeling, did Chaston Talley possess any weapons and presented no imminent harm or danger to Kraeling.

16.

During the pursuit of Mr. Talley, the Defendant Officer Lt. Charles Chapeau, who was the immediate supervisor of the pursuit of Talley, made at least one attempt to intentionally smash into with his police vehicle and make physical contact with Mr. Talley and the dirt bike he was driving. Although this attempt failed, it provided a clear signal to the members of the Crime Suppression Unit that deadly physical force was authorized against Mr. Talley. The use of deadly force against Chaston Paul Talley violated the Georgia Department of Public Safety's Use of Force Policy, the GDPS Pursuit Policy, the Fourth Amendment of the federal constitution and Georgia Law.

17.

Video provided by the Defendants clearly show Kraeling intentionally steering his vehicle sharply to the left causing the vehicle to strike Chaston Paul Talley and his dirt bike with such force that Mr. Talley was propelled into a tree along the roadway of Fairington Road in Dekalb County, Georgia.

18.

Chaston Paul Talley died from major physical injuries to his body caused by the Defendants on August 6, 2022, at the Kennestone Hospital in Marietta, Georgia.

19.

The Defendant Georgia Department of Public Safety has experienced a troublesome history attempting to properly supervise the day-to-day operations of state law enforcement officers engaged in vehicle pursuits of alleged criminal suspects and the use of force that was appropriate to end these pursuits.

20.

The Georgia Department of Public Safety's troubling history of properly conducting such pursuits was aptly recognized during a May 10, 2018, meeting of the Georgia Board of Public Safety when the Commissioner of the Department of Public Safety, Mark W. McDonough, presented the 2017 Pursuit Summary Report.

21.

Commissioner McDonough reported that in 2017, 854 pursuits took place with 473 crashes. This means crashes occurred in 55% of the pursuits. He went on to report that twelve persons had lost their lives due to these pursuits, and he stated

to the Board, "The pursuit business is a messy business and all in law enforcement knows this."

22.

He reported that most of the pursuits took place in Chatham, Dekalb, and Fulton Counties. These counties are all areas where Black citizens were the mayors of the largest cities and Black residents equaled at least 50% of the populations.

23.

Commissioner McDonough particularly singled out one State Trooper who participated in a substantial number of these pursuits – Defendant Lt. Charles Chapeau. The number of pursuits participated in or supervised by Chapeau was so large that pursuits by the Georgia Department of Public Safety's Criminal Interdiction Unit were called "The Charles Chapeau Category." According to McDonough, Chapeau participated in 21 of 24 pursuits (88%). McDonough never stated Chapeau acted constitutionally in these pursuits but concluded despite his age, "(he) goes after those that need to be gotten."

24.

Commissioner McDonough during the meeting discussed the use of the obviously dangerous PIT maneuver which was the only procedure approved by the Department of Public Safety that allowed State Troopers to make physical contact with a fleeing suspect who drove a vehicle.

25.

McDonough at the end of his presentation regarding the PIT maneuver again stated to the Board, "I want to reiterate pursuing is a messy business, a difficult business."

26.

The PIT Maneuver (Precision Immobilization Technique) is a law enforcement pursuit tactic in which vehicles force another vehicle to turn sideways abruptly, causing the driver to lose control and stop. The procedure is both controversial and dangerous because it is the only pursuit technique which authorizes the use of actual physical contact and deadly force to stop a pursuit.

27.

The PIT is controversial and dangerous also because of the possibility that innocent motorists and passengers can be injured or killed. *The Washington Post* on August 24, 2020, reported that the PIT maneuver had been linked to at least

thirty fatalities between 2016 and 2020. Of these fatalities, eighteen occurred when officers attempted to stop motorists for minor traffic violations.

28.

Because of the dangers involved with authorizing physical force to stop a vehicle during a pursuit, many police departments like the Georgia Department of Public Safety enacted regulations to limit the potential risks of the PIT maneuver and limit its use to serious situations, including pursuit of drivers with known outstanding warrants or who are considered likely to be dangerous for other reasons.

29.

Pursuant to the legitimate safety concerns stemming from the use of the PIT maneuver, the GDPS developed three specific policies which would eliminate the death and injury suffered by Chaston Paul Talley.

30.

The first of the two policies were use of force directives which were approved on April 21, 2015. That provision reads:

10.01.6 – Deadly Force

A. A member may use deadly force to apprehend a suspected felon only when the member reasonably believes that the suspect possesses a deadly weapon or any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury; when the member reasonably believes that the suspect poses an immediate threat of physical violence to the member or others; or when there is probable cause to believe that the suspect has committed a crime involving a crime involving the infliction or threatened infliction of serious physical harm. (O.C.G.A. § 17-4-20)

B. The basic responsibility of members to protect life requires that they exhaust all other reasonable means for apprehension and control before resorting to the use of deadly force…

31.

These use of force policies were written to govern the PIT maneuver's use with respect to passenger vehicles. To make sure officers or members clearly understood the greater risks presented by motorcycle and ATV drivers, the GDPS issued the following policy on May 16, 2019:

17.02.4 – Procedures

(E) Terminating a Pursuit

(4)(7)(f) The PIT maneuver **SHALL NOT BE USED** to stop a motorcycle or ATV.

## 32.

It was clear the Department of Public Safety had adopted a "No Physical Contact rule" with respect to motorcycle and ATV drivers like Chaston Paul Talley. The GDPS understood the use of deadly force against motorcycle and ATV drivers was lethal and violated both the Fourth and Fourteenth Amendment and Georgia law.

## 33.

The Defendant Colonel Chris Wright who at all times material, was the Commissioner of the Department of Public Safety and the head of the Georgia State Patrol, along with the Defendant Department of Public Safety, was entrusted with the duty to provide the policy, rules, regulations and appropriate training to ensure that members of the Department of Public Safety, members of the State Patrol and members of the Crime Suppression Unit followed GDPS policy, rules and regulations regarding law enforcement pursuit procedure.

## 34.

Abruptly in April of 2021, Georgia Governor, Brian Kemp, announced that he and Colonel Wright were forming a crime fighting group named the GDPS Crime Suppression Unit. One of the major goals of this unit was to crackdown on what the governor saw as the "soft on crime treatment" of what he called "street racers."

## 35.

Governor Kemp was involved in a tightly contested political race to retain his seat as governor in 2021. His announcement of the Crime Suppression Unit as a major campaign strategy designed to show voters that the governor and Colonel Wright were tough on crime and would aggressively attack the so-called street racers.

## 36.

The governor's view was that locally elected officials in the Atlanta Metropolitan Area were too lenient or soft on these street racers and the

Suppression Unit was put together to wage a more aggressive approach against motorcycle and ATV drivers.

37.

During a debate with his 2022 gubernatorial election opponents, the governor made this statement:

"I am glad to answer this question, I asked Colonel Wright to put together a suppression unit during Civil unrest. When I grew tired of local elected political leaders that wouldn't let their local law enforcement go after dangerous people during civil unrest. They had no chase policies where street racers and street gangs were terrorizing our citizens. I told Colonel Wright I wanted a plan. I wanted to know how much it would cost and who we would work with. I wanted to put together a plan to go after street racers."

38.

According to the National Institute of Justice (NIJ) from 1996 to 2015, police pursuits nationally resulted in more than 6,000 fatal crashes, leading to 7,000 deaths. That is an average of 355 fatalities a year and about one per day.

39.

Despite these alarming statistics, and the inherent dangers involved in using PIT maneuvers, the governor and Colonel Wright continued to demand more aggression from the members of the GDPS Crime Suppression Unit. On March 30, 2022, the governor held a press conference with other government leaders and members of the Crime Suppression Unit. At the press conference, the governor announced that the Unit had been involved in 572 law enforcement vehicle pursuits. This is a remarkable number when one considers that according to the Department of Public Safety in 2018, 852 State Troopers accounted for 854 pursuits statewide. The Criminal Suppression Unit was assigned less than 10 permanent members. If the governor's figures were correct, this small unit accounted for over 67% of the total number of police pursuits by Georgia State Troopers.

40.

Neither the governor, Defendant Wright nor the Suppression Unit announced the number of injuries or deaths that were caused by these pursuits initiated by the Crime Suppression Unit.

41.

Based upon this new political agenda calling for a more aggressive approach to motorcycle and ATV drivers, the new aggressive approach could only be achieved through the execution of one principal strategy. That strategy was to ignore current GDPS policy and authorize the use of deadly force and physical contact against motorcycle and ATV drivers by state troopers and Suppression team members.

42.

On the weekend of June 3rd and June 4th of 2022, the Crime Suppression Unit, Governor Kemp, and Colonel Wright assembled a public relations event exclusively for Atlanta's WSB-TV, the largest television network in the State of Georgia. The purpose of the public relations event was to 'show off' to television viewers how the Defendant's aggressive approach upon so called "street racers" worked.

43.

The staged event featured the governor publicly touting this new aggressive approach. The governor was joined at the staged event by defendant Wright, members of the Crime Suppression Unit and several local Atlanta political figures.

44.

The governor and his wife even boarded a helicopter to view the planned crackdown on street racers that would produce video footage for WSB-TV. Mark Winne, a WSB reporter, and his film crew were even allowed to ride along with the Suppression Unit, which directly contradicted claims that the police operation was dangerous for law enforcement officers or the public. Unfortunately, for the deceased, Chaston Paul Talley, he was not aware he had unwittingly become the star of a television production.

45.

Prior to June 4, 2022, Chaston Paul Talley and several of his friends observed a significant increase in the level of aggressiveness displayed by Georgia State Troopers against motorcycle and ATV riders. The troopers started to make physical contact with motorcycle and ATV drivers in a practice called "bumping." Talley and his friends felt the State Troopers appeared more aggressive and, in some cases, angry in their approach to the motorcycle and ATV drivers. Mr. Talley and his friends felt the State troopers would eventually cause physical injury or death to one of the drivers. This aggression by the state troopers caused Talley and

others to fear for their lives if they were approached by the troopers. The practices conducted by the Defendants constituted a deliberate and intentional use of deadly force against motorcycle and ATV riders.

46.

Based upon the Incident Report of the pursuit and death of Mr. Talley provided by Defendants, the pursuit of Chaston Paul Talley began on June 4, 2022, at 23:00:05 on Moreland Avenue in Atlanta, Georgia. Four seconds later, the report indicates a pursuit was initiated by an unidentified Crime Suppression member. Mr. Talley was headed to his home located at 2148 Hasty Drive in Conyers, Georgia. He was driving a 2021 Blue Yamaha Dirt Bike. Based upon the Incident Report provided by the Defendants, Mr. Talley was not committing a crime at the time the pursuit began.

47.

At all material times during the pursuit of Chaston Talley, Suppression Unit members and the Defendants did not know the identity of Chaston Paul Talley and could not have been aware of any hypothetical or alleged prior criminal warrants or charges against him. Also, Mr. Talley had no weapons and presented no danger to the Defendants as was clearly indicated by the embedded WSB-TV news team with the Suppression Unit. The danger, if any, created by this staged event was caused by the pursuit of Mr. Talley by the Defendants and not by Mr. Talley.

48.

During the 22-minute pursuit, the Defendants chased Mr. Talley through several Atlanta Streets and into Dekalb County. Shortly after the pursuit began, Lt. Charles Chapeau, a supervisor and policy maker for the Suppression Unit, made a deliberate attempt to make physical contact with Chaston Paul Talley by maneuvering the left portion of his vehicle sharply into the right side of Mr. Talley and his small dirt bike. This use of force by the Defendants directed at Talley, if successful would have caused instant injury or death. The attempted striking of Mr. Talley was intentional, deliberate and conducted with malice. The blow was designed not to slow down or impede Mr. Talley, but rather to harm or kill him.

49.

Significantly, when Lt. Chapeau attempted to use deliberate physical force to seize a dirt bike rider in full view of Suppression members, it presented a clear message to the members of the Crime Suppression Unit that they, along with Chapeau, were now allowed to use physical contact and deadly force to dislodge, arrest, or seize motorcycle and ATV drivers and ignore written GDPS policy.

50.

Defendant TFC David Kraeling was a participant, along with other members of the Crime Suppression Unit during this public relations event on June 4, 2022. Kraeling was regularly assigned as a Canine Officer with the Georgia State Patrol's Drug Interdiction Unit. The vehicle that he drove on June 4, 2022, was especially equipped to carry a dog and contained special equipment for this purpose.

51.

Defendant TFC David Kraeling lacked the experience, training, or the skills to follow the policies of the GDPS or to utilize the discretion of a reasonable law enforcement officer required by the U.S. Constitution or other accepted federal or state law. Kraeling was a canine officer who was only assigned to the Suppression Unit because of the deliberate actions of Colonel Wright, Lt. Chapeau and the GDPS to assign officers to the suppression unit who would implement the new more aggressive policies against motorcycle and ATV drivers like Chaston Talley.

52.

After 18 minutes of the pursuit, Mr. Talley was in the appropriate right lane of traffic heading East down Fairington Road in Dekalb County, Georgia. The dash cam video provided by Defendants shows that the vehicle driven by Kraeling pulled along the side of Talley on Talley's left side. As Mr. Talley peacefully rode his dirt bike along the roadway at moderate speeds, Officer Aubree Horton of the Atlanta Police Department, who was riding with Kraeling and occupying the front passenger seat of the vehicle, clearly demonstrated the intention of the Defendants to harm Mr. Talley when he asked his colleague Kraeling, "Do you want me to open the door and hit him?"

53.

Horton was aware that at the time he made this statement Talley presented no immediate harm to the officers. Horton knew that such a blow would critically injure or kill Mr. Talley. Atlanta Officer Horton knew the act was wrong but felt such a deliberate use of force was authorized by the GDPS, Colonel Wright, Lt. Chapeau, and the Crime Suppression Unit.

54.

Kraeling answered Horton and told him "No" because Kraeling knew that striking Talley with an open car passenger door could not even arguably be considered as a legitimate part of an authorized PIT maneuver. TFC Kraeling had

another method of injury or death to Mr. Talley he could use that was not only more lethal than the method suggested by the Atlanta Police Officer, but at the same time presented a possible cover as part of a legitimate PIT Maneuver.

55.

Defendant Kraeling then maneuvered his vehicle to the right towards Talley anticipating Talley would reduce his speed, drop behind Kraeling's car and emerge on the left side of Kraeling's vehicle.

56.

The videos provided by the Defendants show that as Talley pulled his dirt bike along the left side of Kraeling's vehicle, Kraeling made a deliberate intentional maneuver with his vehicle brutally smashing the left side of the vehicle into the right side of Chaston Talley and his dirt bike. The force of the blow from the 4,575-pound Dodge Charger against the 234-pound dirt bike, lifted the bike from the roadway and propelled Talley and the bike into a large tree some ten yards from the roadway. Chaston Talley struck the tree with such force that his body and bike rebounded onto the highway where Kraeling's vehicle appears to run over Mr. Talley.

57.

The blow delivered by Kraeling was a seizure under the fourteenth amendment. It was deliberate and performed with malice. The act of striking Mr. Talley was intentional and Kraeling knew at the time he was doing something wrong. At the time he struck Mr. Talley, Talley presented no immediate harm to Kraeling or Horton, and Talley's driving of the motorcycle presented no reason for Defendants to brutally kill Mr. Talley.

58.

The fact that the contact between the vehicle of Kraeling and Mr. Talley was deliberate, is amplified by the immediate actions made by Kraeling to lie about the incident and attempt to cover up his actions. Even though the video clearly shows Kraeling sharply crashing into Mr. Talley, Kraeling immediately told his fellow officers that Talley had crashed into Kraeling, lost control of his dirt bike and ran into a tree.

59.

The GDPS, its employees, agents and representatives joined with Defendant Kraeling to cover up his actions of deliberately striking the dirt bike of Mr. Talley by compiling a report, DPS Incident Report Number DDS00112311C2, on

September 8, 2022, which misstated the intentional conduct of Kraeling by again reporting Mr. Talley crashed into Kraeling's vehicle and simply lost control of the dirt bike.

60.

The attempt by Defendant GDPS and Kraeling to misstate the facts of the use of deadly force and physical contact caused by Kraeling shows the guilty consciousness of Defendants. The Defendants realized that Mr. Talley possessed no weapons, was not dangerous and presented no imminent harm or danger.

61.

Lt. Charles Chapeau was present during the pursuit and was Kraeling's supervising officer. Lt. Chapeau intentionally ignored the written rules of the Department of Public Safety and participated in this unauthorized pursuit and utilized, approved, and directed the use of the unreasonable deadly force suffered by Chaston Talley. Lt. Chapeau intentionally failed to properly train and supervise the Suppression Unit Officers to follow the rules of the Department of Public Safety, to utilize constitutional pursuits of dirt bikes and to not engage in the use of unreasonable deadly force.

62.

The Defendants lead by Lt. Chapeau and Colonel Wright tried to conceal the cause of the injuries inflicted upon Talley from the news media, the public and Talley's family, when the Defendants would not reveal Talley's name to the ambulance service that transported Talley to the Atlanta Medical Center Hospital located at 303 Parkway Drive NE, Atlanta, Georgia 30312 for emergency treatment. Because the Defendants failed to provide the ambulance service with the correct identity of Mr. Talley, he was admitted into the hospital under the name 'Juniper Juniper.'

63.

Because the Defendants refused to reveal the name of Chaston Talley to the Atlanta Medical Center, Mr. Talley's family members were unable to locate Talley for at least three days.

64.

The Defendants filed a police report on June 5, 2022, containing the full name and contact information for Chaston Talley but refused to communicate this information to the Atlanta Medical Center.

65.

The Defendants made a deliberate effort to mislead the public by providing information to WSB-TV reporter, Mark Winne, indicating Chaston Talley ran into a tree, omitting the facts of the direct intentional deadly force made by Kraeling. Winne announced this inaccurate claim during his TV coverage of the Suppression Unit on June 4, 2022.

66.

The most significant display of the Defendants' awareness of the deliberate malicious use of force against Chaston Talley was wrong, is illustrated by the attempt of by the Defendants to mislead the Dekalb County Medical Examiner's Office.

67.

The autopsy of Talley took place on August 8, 2022. In the first medical report, based upon information the Medical Examiner received from the Department of Public Safety, the medical examiner stated, "This 28-year-old Black male was fleeing from law enforcement on his ATV when he lost control and crashed."

68.

The Medical Examiner conducted an additional investigation of the incident on November 17, 2023, and changed the autopsy report to read, "This 28-year-old Black male was fleeing from law enforcement on a motorcycle when he and the Georgia State Patrol (GSP) MADE CONTACT. Mr. Talley lost control of the motorcycle and crashed."

69.

Mr. Chaston Paul Talley sustained multiple blunt force injuries involving his head, chest, and extremities. Despite medical treatment, he succumbed to his injuries while still hospitalized on August 6, 2022. The injuries included:

a. Generalized blunt force trauma.
b. Recent fracture of left partial bone with surgical intervention.
c. Recent, partially healed fracture of left base of frontal bone.
d. Blunt thoracic trauma, resolved.
e. Stage II sacral decubitus ulcer
f. Resolving bilateral pneumonia.
g. Closed head injury with subarachnoid and subdural hemorrhage.
h. Fractures of the clavicle and lower extremities.

i.  Status post-multiple diagnostics, therapeutic and/or resuscitative procedures.

## Count I – O.C.G.A. § 50-5-21 – Georgia Tort Claims Act Violations

*Plaintiff v. Georgia Department of Public Safety*

70.

Plaintiff incorporates and realleges all preceding paragraphs as though fully pleaded herein.

71.

The conduct exhibited by the Georgia Department of Public Safely in this count and described herein, constituted intentional, excessive deadly force in violation of the Georgia Tort Claims Act, and clearly established law.

72.

At all times material hereto, Defendant Georgia Department of Public Safety was acting under color of state law, as an agent and agency of the State of Georgia and it is within the scope of their authority as the duly designated law enforcement agency to provide for the safety of the streets of the State of Georgia and the safety of Georgia citizens.

73.

At all times material hereto, Defendant was charged with developing clearly defined and written rules, policies and regulations regarding the pursuit, arrest and seizure of alleged suspects driving motorcycles and ATVs by the Georgia State Parole and other State or local agencies under Defendant's command by regular assignment or through the creation of task force groups of law enforcement personal. Defendant was particularly charged with the responsibility of developing clearly defined and written rules, polices and regulations related to the use of deadly force by such law enforcement officers in connection with the pursuit, arrest or seizure of alleged suspects driving motorcycles and ATVs.

74.

At all times material hereto, Defendant was also charged with the responsibility of providing frequent and specialized training in the area of pursuits, arrests and seizures of alleged suspects driving motorcycles and ATVs for all members of the Georgia State Patrol or other State agencies or local agencies

coming within their command by regular assignment or through the creation of law enforcement task force groups.

75.

At all times material hereto, Defendant was also particularly charged with the responsibility of providing frequent, appropriate and specialized training regarding the use of deadly force by members of the Georgia State Patrol or other State Agencies or local agencies working within their command by regular assignment or through the creation of law enforcement task force groups when pursuing, arresting or seizing alleged suspects driving motorcycles and ATVs.

76.

At all times material hereto, Defendant due to its position as a department or agency level organization within the State of Georgia, was also charged with the responsibility of providing leadership, policies, rules, and regulation when the governor or the Governor's Office announces political strategies which involve the Department of Public Safety and its employees, directing the employees to pursue a dangerous, malicious use of intentional force against motorcycle and ATVs drivers, designed to show Georgia citizens that the political actors were "tough on crime."

77.

At all times material hereto, Defendant GDPS was the employer of the defendants Colonel Chis Wright, Lt. Charles Chapeau and TFC David Kraeling.

78.

The Defendant Georgia Department of Public Safety was clearly on notice that the use of deadly force was constitutionally unreasonable and violated the Georgia torts of Assault and Battery and caused the Intentional Infliction of Emotional Distress when the driver of a motorcycle or ATV posed no immediate threat of violence such notice being provided in court decisions like *Tennessee v. Garner,* 471 U.S. 1, (1985).

79.

The Department of Public Safety had through the years drafted, distributed policies, regulations, and rules designed to govern the use of force against Motorcycle and ATV drivers by Georgia State Troopers. In fact, the current policy of the department would prevent the use of force or contact with a motorcycle or ATV driver in the position of Chaston Talley. The Defendant was also aware that both the motorcycle and ATV pursuit policies of the City of Atlanta and Dekalb

County, the municipalities wherein Chaston Talley was pursued, would also prohibit the intentional use of force applied to Mr. Talley.

80.

After the Governor intervened in April of 2021 and created the Georgia Public Safety Crime Suppression Unit, the Defendant Georgia Department of Public Safety abandoned its own policies and ignored the polices of local municipalities to pursue an intentionally aggressive political approach which appeared to be designed to aid the governor in his race for the governor's seat.

81.

The Department failed to develop the appropriate rules, policies, and regulations designed to promote the constitutional use of force for tis employees after the Crime Suppression Unit was created.

82.

The Department of Public Safety failed to provide the appropriate specialized training needed to govern the use of force by its employees against motorcycle and ATV drivers.

83.

The Department of Public Safety failed to provide the leadership and direction necessary to allow members of the Crime Suppression Unit to ignore the unwise political agendas which encouraged law enforcement officers to exercise the use of force in a manner inconsistent with clearly recognized law.

84.

The Defendant Georgia Department of Public Safety abandoned its position of leadership and lawful policy making and joined in the pursuit of a dangerous political strategy.

85.

The members of the Georgia Department of Public Safety and its Board of Commissioners failed to take any actions to restrain Colonel Chris Wright from ignoring GDPS pursuit and use of force policies and allowing TFC Kraeling to violate such policies and use intentional deadly force to injure and kill Chaston Paul Talley.

86.

Defendant Georgia Department of Public Safety intentionally chose to allow Colonel Wright to join with the governor in forming a Criminal Suppression Unit, which adopted as its major goal, a more aggressive approach against motorcycle and ATV drivers. GDPS was aware that such an aggressive approach would mean suppression members would then believe themselves authorized to use deadly force against defenseless motorcycle and ATV drivers.

87.

Defendant GDPS ignored several incidents of injury to motorcycle and ATV drivers caused by Criminal Suppression members using new political strategy of aggression towards motorcycle and ATV drivers prior to June 4, 2022.

88.

The Defendant Georgia Department of Public Safety increased the danger to the motorcycle and ATV drivers by assigning Lt. Charles Chapeau as the supervisor of the Crime Suppression Unit. The department was aware that Chapeau was personally responsible for an outrageously large number of law enforcement pursuits in Georgia and that many of the pursuits involved injuries.

89.

The Defendant Georgia Department of Public Safety by its clear intentional violation of clear, direct, and simple ministerial duties violated the Georgia Tort Claims Act by assigning TFC David Kraeling to the Georgia Public Safety Criminal Suppression Unit. Kraeling was a canine officer with the State Patrol Drug Interdiction Unit. Kraeling was not qualified to make appropriate decisions regarding the use of Deadly Force against motorcycle and ATV drivers. The inclusion of Kraeling provided proof that the GDPS assigned officers to the Suppression Unit who were willing to follow the more aggressive approach, as opposed to law enforcement officers who were properly trained skilled.

90.

Because of the intentional conduct of the GDPS, TFC Kraeling used his police vehicle to slam into the side of the dirt bike driven by Chaston Paul Talley. Kraeling's vehicle struck Mr. Talley with such force that Mr. Talley and his dirt bike were propelled into a tree approximately ten yards off the roadway.  Mr. Talley and his bike were propelled into the tree with such force that Talley was thrown back onto the roadway and run over by Kraeling's vehicle.

91.

At all material times, Chaston Paul Talley possessed no weapons and presented no danger to Kraeling. Chaston Paul Talley presented no imminent threat of harm to Kraeling, and his use of deadly force was primarily prompted by the political directive supported by the GDPS, which sought an aggressive approach to motorcycle and ATV drivers. The use of deadly force was unreasonable and in violation of Georgia Tort law.

92.

The use of excessive deadly force by the defendant Kraeling caused tremendous damage and death to the body and person of Chaston Paul Talley. Such damage included:

a. Generalized blunt force trauma.
b. Recent fracture of left partial bone with surgical intervention.
c. Recent, partially healed fracture of left base of frontal bone.
d. Blunt thoracic trauma, resolved.
e. Stage II sacral decubitus ulcer
f. Resolving bilateral pneumonia.
g. Closed head injury with subarachnoid and subdural hemorrhage.
h. Fractures of the clavicle and lower extremities.
i. Status post-multiple diagnostics, therapeutic and/or resuscitative procedures.

93.

At all material times, Kraeling was an employee of the Georgia Department of Public Safety and acted under color of law at their instruction and direction.

94.

On June 4, 2022, the date Chaston Paul Talley was injured, the Georgia Department of Public Safety arranged a political event using the resources of the State of Georgia to create and simulate the pursuit of an ATV driver to match the political strategy of a more aggressive approach against motorcycle and ATV drivers. The political event was created to provide video footage to WSB-TV which would broadcast the simulated pursuit to show that the defendant and other political actors were tough on crime.

95.

As a direct and proximate result of its acts and conduct violating the Georgia Tort Claims Act causing Battery and Assault, Intentional Infliction of Emotional

Distress and Failure to Maintain Physical Evidence by the Defendant Georgia Department of Public Safety described herein, Chaston Paul Talley and the Plaintiff suffered compensatory and special damages as defined under State law in an amount to be determined by jury.

## Count II – O.C.G.A. § 50-5-21 – Georgia Tort Claims Act Violations

*Plaintiff v. Officers Kraeling, Chapeau and Wright, in Their Official Capacities*

96.

Plaintiff incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

97.

The conduct by the officers identified in this count and described herein constituted intentional excessive and deadly force in violation of the Georgia Tort Claims Act, and clearly established law.

98.

At all material times, Defendants Kraeling, Chapeau and Wright were each acting under the color of state law, as agents and employees of the Georgia Department of Public Safety, and within the scope of their employment and authority as duly certified law enforcement officers of the State of Georgia.

99.

At all times material hereto, Defendant Colonel Chris Wright was the Commissioner of the Department of Public Safety, Commander of the Georgia State Patrol, co-founder of the Georgia Department of Public Safety's Crime Suppression Unit and acting in a supervisory capacity. Directly because of his failure to require the members of the Crime Suppression Unit to follow the rules of the Department of Public Safety, regarding the use of deadly force and physical contact against drivers of motorcycles and ATVs; his failure to provide training for members of the suppression unit , instructing such employees, agents or representatives of GDPS to comply with the Fourth Amendment and established laws regarding the use of excessive force; and because he failed to provide the proper instruction and leadership to the members of the Crime Suppression Unit when the unit received a political command from the governor to "go after motorcycle and ATV drivers", Chaston Paul Talley was brutally and unnecessarily killed by the Defendants in violation of the Georgia Tort Claims Act.

100.

Additionally, because he failed to take measures limiting membership to the Crime Suppression Unit to law enforcement officers who were uniquely qualified to properly conduct pursuits, arrests and seizures of motorcycle and ATV drivers and because Wright in fact included persons who were canine officers, like TFC Kraeling, who were unqualified to serve as members of a law enforcement unit directed to "go after" motorcycle and ATV drivers, Wright's actions caused an assault and battery and Intentional Infliction Of Emotional Distress upon Chaston Paul Talley in violation of the Georgia Tort Claims Act.

101.

Defendant Wright as supervisor failed to prevent the staging of a media event with WSB-TV, which had the effect of compelling members of the Suppression Unit and TFC Kraeling, under the color of law, to unnecessarily and unconstitutionally pursue, arrest, and use unreasonable force against Chaston Talley for the purpose of creating footage for WSB-TV, as opposed to a legitimate law enforcement purpose.

102.

At all material times hereto, Defendant Chapeau acted in a supervisory capacity as a field lieutenant. Defendant Chapeau directly participated in the illegal pursuit of Chaston Talley by personally chasing and pursuing Mr. Talley while driving his law enforcement vehicle, even attempting to make physical contact with Mr. Talley as he attempted to drive to his home on a dirt bike.

103.

Defendant Chapeau was an active participant in the staging and execution of the media event which led to the pursuit of Chaston Talley by Crime Suppression Unit members and provided TV video footage to WSB-TV. Defendant Chapeau allowed the WSB reporter to ride along with Suppression members while the chase was being filmed. Allowing a member of the press or other civilians to ride along with the Crime Suppression Unit while chasing Chaston Talley with at least five law enforcement vehicles and a helicopter provided a clear indication that Mr. Talley presented no danger or harm to the public, TFC Kraeling and/or other suppression unit members.

104.

Defendant Chapeau's supervisory methods encouraged and promoted the use of physical contact and deadly force against motorcycle and ATV drivers by

members of the Crime Suppression Unit. Chapeau's supervisory methods or lack thereof, directly lead to the use of deadly force by TFC Kraeling. Because Chapeau endorsed and participated in the more aggressive approach favored by the governor and Colonel Wright, this endorsement inevitably led to the conclusion among Suppression members that they were authorized to use deadly force against motorcycle and ATV drivers.

105.

At all material times, Kraeling had no reason to believe that Chaston Talley was armed or dangerous.

106.

At all material times, Kraeling did not have a reasonable fear of imminent bodily harm when he forcefully crashed his law enforcement vehicle, a 4,575-pound Dodge Charger into the unprotected body of Mr. Talley as he drove his 234-pound dirt bike towards his home in Rockdale County, Georgia.

107.

Every reasonable officer would have known that making physical contact and using deadly force with a large police vehicle against a small unprotected dirt bike at the speed limit of the roadway and whose driver of the ATV had no weapon and was not attempting in any manner to make contact with any law enforcement officials, and such driver is not wanted or suspected by the police for any forcible felony, constitutes excessive force, commission of a battery and an assault, and intentional infliction of emotional distress in violation of the Georgia Tort Claims Act.

108.

Kraeling's use of deadly force in propelling or violently using the left side of his vehicle as a battering ram was objectively unreasonable and violated clearly established law and law enforcement pursuit policies.

109.

The Defendants use of excessive force caused Mr. Chaston Talley tremendous damage to his body which included:

a. Generalized blunt force trauma.
b. Recent fracture of left partial bone with surgical intervention.
c. Recent, partially healed fracture of left base of frontal bone.
d. Blunt thoracic trauma, resolved.

e. Stage II sacral decubitus ulcer
f. Resolving bilateral pneumonia.
g. Closed head injury with subarachnoid and subdural hemorrhage.
h. Fractures of the clavicle and lower extremities.
i. Status post-multiple diagnostics, therapeutic and/or resuscitative procedures.

110.

His injuries were so extensive that he was transferred from Atlanta Medical Center to Kennestone Hospital in Marietta, Georgia on June 30, 2022.

111.

During his treatment and stay at the hospital, Chaston Paul Talley endured tremendous pain and suffering for 63 days (about 2 months). Finally on August 6, 2022, M. Talley's pain ended when he died at the Kennestone Hospital.

112.

As a direct and proximate result of the acts described herein, Chaston Paul Talley suffered compensatory and special damages as defined under federal common law and in an amount to be determined by jury.

## Count III – 42 U.S.C. § 1983 – Fourth Amendment Violations

*Plaintiff v. Georgia Department of Public Safety*

113.

Plaintiff incorporates and realleges all preceding paragraphs as though fully pleaded herein.

114.

The conduct exhibited by the Georgia Department of Public Safely in this count and described herein, constituted intentional, excessive deadly force in violation of the Fourth Amendment and 42 U.S.C. § 1983 and clearly established law.

115.

At all times material times, Defendant the Georgia Department of Public Safety was acting under color of state law, as an agent and agency of the State of Georgia and it is within the scope of their authority as the duly designated law

enforcement agency to provide for the safety of the streets of the State of Georgia and the safety of Georgia citizens.

116.

At all times material hereto, Defendant was charged with developing clearly defined and written rules, policies and regulations regarding the pursuit, arrest and seizure of alleged suspects driving motorcycles and ATVs by the Georgia State Parole and other state or local agencies under Defendant's command by regular assignment or through the creation of task force groups of law enforcement personnel. Defendant was particularly charged with the responsibility of developing clearly defined and written rules, polices and regulations related to the use of deadly force by such law enforcement officers in connection with the pursuit, arrest or seizure of alleged suspects driving motorcycles and ATVs.

117.

At all times material hereto, Defendant was also charged with the responsibility of providing frequent and specialized training in the area of pursuits, arrests and seizures of alleged suspects driving motorcycles and ATVs for all members of the Georgia State Patrol or other state agencies or local agencies coming within their command by regular assignment or through the creation of law enforcement task force groups.

118.

At all times material hereto, Defendant was also particularly charged with the with the responsibility of providing frequent, appropriate and specialized training regarding the use of deadly force by members of the Georgia State Patrol or other state agencies or local agencies coming within its command by regular assignment or through the creation of law enforcement task force groups like the Crime Suppression Unit , when pursuing, arresting or seizing alleged suspects driving motorcycles and ATVs.

119.

At all times material hereto, Defendant due to its position as a department or agency level organization within the State of Georgia, was also charged with the responsibility of providing leadership, policies, rules, and regulations which required law enforcement officers and Crime Suppression Members to employ the use of force protections created by the Fourth Amendment of the U.S. Constitution rather than to enforce unconstitutional political strategies favored by certain Georgia political actors which encouraged the Department of Public Safety and its employees to pursue a dangerous, malicious use of intentional deadly force against

motorcycle and ATVs drivers, designed to show Georgia citizens that the political actors were "tough on crime."

### 120.

The Defendant Georgia Department of Public Safety was clearly on notice that the use of deadly force was constitutional unreasonable and violated the Fourth Amendment when the driver of a motorcycle or ATV who posed no immediate threat of violence suffered unreasonable deadly force through court decisions like *Tennessee v. Garner,* 471 U.S. 1, (1985) and the written policies of its own department.

### 121.

The Department of Public Safety had through the years drafted and distributed policies, regulations, and rules designed to govern the use of force against motorcycle and ATV drivers by Georgia State Troopers and employees of the GDPS. In fact, the policy of the department on June 4, 2022, would prohibit the use of deadly force or physical contact with a motorcycle or ATV driver in the position of Chaston Talley. The Defendant was also aware that both the motorcycle and ATV pursuit policies of the City of Atlanta and Dekalb County, the municipalities wherein Chaston Talley was pursued, would also prohibit the intentional use of force applied to Mr. Talley.

### 122.

After the governor intervened in April of 2021 and created the Georgia Public Safety Crime Suppression Unit along with Defendant Colonel Chris Wright, the Defendant Georgia Department of Public Safety abandoned its own policies and ignored the policies of local municipalities to pursue an intentionally aggressive political approach which appeared to be designed to aid the governor in his race for the governor's seat.

### 123.

The GDPS failed to develop the appropriate rules, policies, and regulations regarding the use of deadly force by members of the Criminal Suppression Unit against motorcycle and ATV drivers.

### 124.

The department also failed to provide the leadership necessary to allow members of the crime suppression unit to resist and ignore the call for law enforcement officers and the suppression unit to violate the reasonable constitutional protections regarding the use of deadly force by law enforcement

officers acting under color of law against motorcycle and ATV drivers and submit to political strategies designed to reflect a more aggressive attack upon motorcycle and ATV drivers like Chaston Talley.

125.

The Defendant Georgia Department of Public Safety increased the danger to innocent motorcycle and ATV drivers like Chaston Talley by assigning Lt. Charles Chapeau as the supervisor of the Crime Suppression Unit. The GDPS was aware that Chapeau was personally responsible for an outrageously large number of law enforcement pursuits in Georgia and that many of the pursuits involved injuries to both law enforcement officers and citizens.

126.

The Defendant Georgia Department of Public Safety through its intentional violation of the clear, direct, and simple ministerial duty to properly staff the Crime Suppression Unit, violated this duty by re- assigning TFC David Kraeling from his status as a canine officer to the Crime Suppression Unit. The Defendant realized that this re-assignment was designed and intentionally made to bring law enforcement officers to the Suppression Unit who were willing to follow the more aggressive approach as opposed to law enforcement officers who were properly trained.

127.

Because of the intentional conduct of the GDPS, TFC Kraeling used his police vehicle to ram into the side of the dirt bike driven by Chaston Talley. Kraeling's vehicle struck Mr. Talley with such force that Mr. Talley and his dirt bike were propelled into a tree appropriately ten yards away the roadway Mr. Talley's bike was flung into the tree with such force that Talley was propelled back onto the roadway and run over by Kraeling's vehicle.

128.

At all material times, Chaston Talley possessed no weapons and presented no danger to Kraeling. Chaston Paul Talley presented no imminent threat of harm to Kraeling, and the use of deadly force was prompted by the political directive to Kraeling to be more aggressive and the creation of media event for WSB-TV. The use of deadly force by Kraeling at this time was unreasonable and clearly in violation of the Fourth Amendment of the U.S. Constitution and 42 U.S.C. § 1983.

129.

The use of excessive deadly force by the Defendant Kraeling caused tremendous damage and death to the body and person of Chaston Paul Talley. Such damage included:

a. Generalized blunt force trauma.
b. Recent fracture of left partial bone with surgical intervention.
c. Recent, partially healed fracture of left base of frontal bone.
d. Blunt thoracic trauma, resolved.
e. Stage II sacral decubitus ulcer
f. Resolving bilateral pneumonia.
g. Closed head injury with subarachnoid and subdural hemorrhage.
h. Fractures of the clavicle and lower extremities.
i. Status post-multiple diagnostics, therapeutic and/or resuscitative procedures.

130.

At all material times, Kraeling was an employee of the Georgia Department of Public Safety and acted under color of law at their instruction and direction.

131.

As a direct and proximate result of its acts and conduct violating the Fourth Amendment and 42 U.S.C. § 1983 by the Georgia Department of Public Safety described herein, Chaston Paul Talley suffered compensatory and special damages as defined under federal law and in an amount to be determined by jury.

## Count IV – 42 U.S.C. § 1983 – Fourth Amendment Violations

*Plaintiff v. Kraeling, Chapeau and Wright, in Their Official Capacities*

132.

Plaintiff incorporates and realleges all preceding paragraphs as though fully pleaded herein.

133.

The conduct exhibited by the Defendant's officers TFC David Kraeling, Lt. Charles Chapeau and Colonel Chris Wright in this count and described herein, constitutes intentional, excessive deadly force in violation of the of the Fourth Amendment and 42 U.S.C. § 1983 and clearly established law.

134.

At all material times, Defendants Kraeling, Chapeau and Wright were acting under color of state law, as employees, agents and representatives of the Department of Public Safety and the State of Georgia and were within the scope of their authority.

135.

At all times material hereto, Defendant Colonel Chris Wright was the Commissioner of the Department of Public Safety, Commander of the Georgia State Patrol and co-founder of the Georgia Department of Public Safety's Crime Suppression Unit and acted in a supervisory capacity. Because of Colonel Wright's intentional failure to require the members of the Crime Suppression Unit to follow the rules of the Department of the Public Safety regarding the use of physical contact and use of deadly force against drivers of motorcycles and ATVs; his failure to provide training to members of the Suppression Unit to properly comply with the United States Constitution and established laws regarding the use of excessive force; and because he failed to provide the proper instruction and leadership to the Crime Suppression Unit which would have allowed unit members to follow the Fourth Amendment and established law and ignore political directives to "go after motorcycle and ATV drivers", the Defendant officers used unreasonable unconstitutional deadly force against Chaston Paul Talley. The deadly force used by Kraeling was sanctioned by Defendant Colonel Chris Wright.

136.

At all times material hereto, Defendant as Commissioner of the Department of Public Safety, Commander of the Georgia State Patrol and co-founder and Commander of the GDPS Criminal Suppression Unit, was charged with authority and duty of developing clearly defined, written rules, policies and regulations regarding the pursuit, arrest and seizure of alleged suspects driving motorcycles and ATVs by the Georgia State Parole, the Criminal Suppression Unit and other state or local agencies under the Defendant's command. Defendant was particularly charged with the responsibility of developing clearly defined and written rules, polices and regulations related to the use of deadly force by such law enforcement officers against drivers motorcycles and ATVs. Defendant intentionally failed in these responsibilities.

137.

At all times material hereto, Defendant Wright was also charged with the duty of providing frequent and specialized training in the area of pursuits, arrests and seizures of alleged suspects driving motorcycles and ATVs for all members of the Georgia State Patrol, members of the Criminal Suppression Unit or other state agencies or local agencies coming within his command by regular assignment or through the creation of law enforcement task force groups. Defendant intentionally failed in these responsibilities.

138.

At all times material hereto, Defendant was also particularly charged with the with the responsibility of providing frequent, appropriate and specialized training regarding the use of constitutional, reasonable deadly force by members of the Georgia State Patrol, members of the Criminal Suppression Unit or other state agencies or local agencies coming within his command by regular assignment or through the creation of law enforcement task force groups when pursuing, arresting or seizing alleged suspects driving motorcycles and ATVs.

139.

At all times material hereto, Defendant due to his position as the head of a law enforcement department, office or agency within the State of Georgia, was also charged with the responsibility of providing leadership, policies, rules, and regulations, which would strictly forbid law enforcement officers from engaging in conduct designed to promote the views of a political candidate. Because Colonel Wright joined, endorsed, and encouraged law enforcement officers to fully embrace the use of conduct which supported the political views of a political candidate, a dangerous, malicious use of intentional deadly force was unleashed against Chaston Paul Talley.

140.

The Defendant Colonel Chris Wright was clearly on notice that the use of deadly force administered to Chaston Paul Talley was unreasonable and violated the Fourth Amendment of the United States Constitution and 42 USC § 1983 when the driver of a motorcycle or ATV posed no immediate threat of violence to officers through court decisions like *Tennessee v. Garner,* 471 U.S. 1, (1985).

141.

The Department of Public Safety had through the years drafted distributed policies, regulations, and rules designed to govern the use of force against

motorcycle and ATV drivers by Georgia State Troopers. In fact, the June 4, 2022, policy of the GDPS would prohibit the use of deadly force or physical contact with a motorcycle or ATV driver in the position of Chaston Talley. The Defendant Wright was also aware that both the motorcycle and ATV pursuit policies of the City of Atlanta and Dekalb County, the municipalities and county wherein Chaston Talley was pursued, would also prohibit the intentional use of deadly force applied against Mr. Talley.

142.

After the Governor in April of 2021 along with Colonel Wright, organized the Georgia Public Safety Crime Suppression Unit, the Defendant abandoned the GDPS's own written pursuit and use of force policies and ignored the policies of the local municipalities where the use of deadly force was used, in favor of an intentionally aggressive political approach which was designed to aid the governor in his race for the governor's seat.

143.

Defendant Wright further abandoned his duty of providing for the safety of citizens of Georgia by authorizing Lieutenant Charles Chapeau to serve as supervisor of the GDPS Crime Suppression Unit. Lt. Chapeau had compiled a long history of aggression with respect to the pursuit of suspected vehicle drivers. The GDPS credited Chapeau with a reasonable number of pursuits, many of which resulted in injuries.

144.

At all times material hereto, Defendant Chapeau acted in a supervisory capacity as a field lieutenant. Not only did Chapeau provide firsthand and direct supervision of the Crime Suppression Unit, but he was also an actual participant in the pursuit and attempt to use intentional deadly force against Chaston Paul Talley.

145.

Defendant Chapeau not only failed to properly supervise the members of the Crime Suppression Unit, but during the unconstitutional pursuit of Talley, Chapeau in clear violation of the Fourth Amendment and well-established law, attempted to ram the side of his law enforcement vehicle into the dirt bike and person of Chaston Paul Talley.

146.

By attempting to ram the side of his vehicle into the dirt bike and body of Mr. Talley, in open and clear view of the members of Crime Suppression Unit, Defendant Chapeau through his unconstitutional attempt to use deadly force, left no doubt that the use of deadly force against motorcycle and ATV drivers was permissible and encouraged.

147.

Both Defendants Wright and Chapeau authorized the inclusion of TFC David Kraeling as a member the Crime Suppression Unit even though both Defendants realized that he lacked the necessary training or skills for this assignment. Kraeling was a member of the Georgia State Troopers Drug Interdiction Unit wherein he served as a canine officer. This failure by Wright and Chapeau directly led to a violation of the Fourth Amendment rights of Mr. Talley and his painful and premature death.

148.

Both Defendants Wright and Chapeau authorized and assisted in the staging of a public relations event on June 4, 2022. The purpose of the staged event was to use the publicly taxpayer funded Crime Suppression Unit to produce exclusive video footage for WSB-TV for commercial purposes to demonstrate to the station's viewers that the use of deadly force against motorcycle and ATV drivers like Chaston Talley was necessary to reduce crime and demonstrate that Georgia was tough on crime.

149.

Because both Wright and Chapeau helped arrange this staged event, the members of the Crime Suppression Unit were forced to abandon normal law enforcement discretion and create video footage for WSB-TV in violation of the Fourth Amendment and 42 U.S.C. § 1983.

150.

Defendant Kraeling, because of the intentional conduct of the Department of Public Safety, Colonel Wright, and Lt. Chapeau, made the intentional decision to ram the left side of his vehicle into the body and dirt bike of Chaston Paul Talley.

151.

At the time of the use of force, Mr. Talley possessed no weapons and presented no imminent danger to TFC Kraeling.

152.

Kraeling was aware that his actions would cause immediate significant injury and death to Mr. Talley for alleged motorcycle or ATV moving violations. Kraeling realized his use of deadly force was wrong and violative of the Fourth Amendment.

153.

After the injury to Mr. Talley, the Defendants combined their efforts to mislead the public, the family of Chaston Talley, and the Dekalb County Medical examiner to believe Mr. Talley's death was caused by him losing control of his dirt bike and running into a tree. The Defendants all realized this was not true.

154.

The Defendants' use of excessive deadly force caused tremendous damage to the body of Chaston Paul Talley. The injuries include:

a. Generalized blunt force trauma.
b. Recent fracture of left partial bone with surgical intervention.
c. Recent, partially healed fracture of left base of frontal bone.
d. Blunt thoracic trauma, resolved.
e. Stage II sacral decubitus ulcer
f. Resolving bilateral pneumonia.
g. Closed head injury with subarachnoid and subdural hemorrhage.
h. Fractures of the clavicle and lower extremities.
i. Status post-multiple diagnostics, therapeutic and/or resuscitative procedures.

155.

Chaston Paul Talley's injuries were so extensive that he was transferred from the Atlanta Medical Center to Kennestone Hospital in Marietta, Georgia on June 30, 2022.

156.

During treatment and stay at both hospitals, Chaston Paul Talley endured acute pain and suffering for 63 days (about 2 months). Finally, on August 6, 2022, the pain and suffering of Mr. Talley ended when he died at Kennestone Hospital.

157.

As a direct and proximate result of the acts and conduct described herein, Chaston Paul Talley suffered compensatory and special damages as defined under federal common law and in an amount to be determined by jury.

158.

Plaintiff is entitled to recovery of costs, including reasonable attorney's fees under 42 U.S.C. § 1988.

## Count V – Wrongful Death

*Plaintiff v. All Defendants, in Their Official Capacities*

159.

Plaintiff hereby incorporates and re-alleges all preceding paragraphs as fully pleaded herein.

160.

As a direct and proximate result of the wrongful intentional acts and conduct of Defendants as described herein, Chaston Paul Talley, his mother Celesta Scott, as Administrator of the Estate of Chaston Paul Talley is entitled to recover any and all damages resulting from the wrongful death of Chaston Paul Talley, including but not limited to, the full value of Mr. Talley's life, including economic damages, non-economic damages and the loss of the enjoyment of living.

## Count VI – Intentional Infliction of Emotional Distress

*Plaintiff v. All Defendants, in Their Official Capacities*

161.

Plaintiff incorporates and realleges all preceding paragraphs as thoughtfully pleaded herein.

162.

The conduct of the defendants, using deadly force, violently smashing a police vehicle into the small dirt bike and body of Chaston Paul Talley under color of state law was designed to injure and kill Mr. Talley and such conduct was intentional and reckless and caused intentional emotional distress upon Chaston Paul Talley and the plaintiff.

163.

The conduct by the defendants was extreme and outrageous in that it was part of a staged media event designed to produce exclusive video footage for a television station.

164.

The conduct of the defendants was extreme and outrageous in that the conduct was motivated by political agenda that emphasized law enforcement aggression against motorcycle and ATV drivers which included the use of deadly force, despite the fact that such force is inconsistent with the U.S. Constitution and the laws of the State of Georgia.

165.

The conduct of the defendants was extreme and outrageous in that at the time Chaston Paul Talley was smashed into by defendants, he possessed no weapons and presented no harm to the defendant or others. Such was the safe nature of the incident that the defendants allowed the television station that the event was arranged to benefit to ride along during the pursuit and brutal attack upon Mr. Talley.

166.

The conduct of the defendants was extreme and outrageous in that the defendants immediately attempted to conceal their intentional wrongdoing by concocted a false story accusing Chaston Paul Talley of losing control of his dirt bike while fleeing from the police, refusing to acknowledge the physical contact made by TFC Kraeling with his police vehicle.

167.

The conduct of the defendants was extreme and outrageous in that the defendants even went to the extent of mis leading the Dekalb County Medical Examiner's Office about the details of Mr. Talley's death.

168.

The conduct of the defendants was extreme and outrageous in that even after they had intentional caused the death of Mr. Talley the defendants refused to

provide the name or contact information of Mr. Talley to the Atlanta Medical Center, the hospital that initially provided medical treatment. The hospital was forced to admit him under the name "Juniper Juniper." Because of such extreme and outrageous conduct, Mr. Talley's family was unable to locate him for three days.

169.

The conduct of the defendants was extreme and outrageous in that after smashing a police vehicle into Mr. Talley's dirt bike and realizing this bike contained biological and physical evidence of the defendant's intentional conduct, in clear violation of Georgia Law, the defendants failed to maintain custody of the dirt bike which would have allowed testing by the plaintiff or criminal prosecutors.

170.

After causing the injury to Mr. Talley,  he suffered through extreme physical and emotional pain for 64 days before he died. There is no doubt that the emotional distress suffered by Mr. Talley and the plaintiff was directly caused by the defendants.

171.

As a direct and proximate result of the acts  and described herein, Chaston Paul Talley and plaintiff suffered compensatory and special damages as defined under Georgia law and federal common law in an amount to be determined by jury.

### Count VII – Violation of O.C.G.A. 17-5-56
### Failure to Maintain Physical Evidence Containing Biological Material

*Plaintiff v. All Defendants, in Their Official Capacities*

172.

Plaintiff incorporates and re-alleges all preceding paragraphs as thoughtfully pleaded herein.

173.

After the defendant TFC David Kraeling used deadly force slamming his police vehicle into the Yamaha dirt bike and person of Chaston Paul Talley, the dirt bike driven by Talley was seized by the defendants.

174.

The Yamaha bike contained evidence that when examined scientifically would clearly show that the story issued by the defendants regarding the injury and death of Chaston Talley which claimed Mr. Talley lost control of his bike and struck a tree while fleeing from the police was patently untrue. The evidence contained on the bike would show that the bike was struck by the vehicle driven by Kraeling.

175.

The Yamaha bike's metal physical structure and how that physical structure was bent or changed due to the force of Kraeling vehicle could be scientifically measured to determine the amount of force received by the bike, the angle of the impact and the damage caused by the impact of Kraeling's vehicle.

176.

The bike likely contained paint transfers from Kraeling's vehicle which when examined scientifically would reveal the nature and intensity of the impact caused by the state police vehicle driven by Kraeling.

177.

Chaston Paul Talley was critically injured by the use of force delivered by defendants. His body bled profusely as he received the full impact of the blow from Kraeling. The bike contained blood, skin, liquids and other biological material which related to the identity of the perpetrator of the crime and its preservation would have ensured that the plaintiff had the opportunity to examine and test the evidence, which was crucial for a fair determination of the facts of this case and the opportunity to test the evidence independently.

178.

Pursuant to O.C.G.A. 17-5-56 the defendants were required to maintain, retain and store the bike until criminality or liability were determined. It does not

mean that the defendant can dispose of the physical evidence to conceal wrongdoing on the part of law enforcement officers acting under color of law.

179.

Shortly after Mr. Talley was injured and killed by the defendants, the bike was put up for public auction by the defendants and not maintained as the law requires. Plaintiff has been unable to examine the bike and collect the scientific evidence it contained.

180.

The defendants failed to maintain or store the bike because they knew that it contained evidence, which if collected and tested scientifically could demonstrate specific evidence pertaining to the use of unreasonable deadly force administered by Georgia Department of Public Safety, Colonel Chris Wright, Lt. Charles Chapeau, and TFC David Kraeling.

181.

As a direct and proximate result of the acts and conduct described herein, Chaston Paul Talley and the Plaintiff suffered compensatory and special damages as defined under federal and state law and in an amount to be determined by the jury.

## Count VIII – Punitive Damages

*Plaintiff v. All Defendants, in Their Official Capacities*

182.

Plaintiff hereby incorporates and re-alleges all preceding paragraphs as thoughtfully pleaded herein.

183.

On June 4, 2022, members of the Georgia Public Safety Crime Suppression Unit were authorized to conduct pursuits, arrests and pursuits of motorcycle and ATV drivers in a more aggressive manner because of a political mandate from Georgia's governor.

184.

Because the pursuit of the Georgia Public Safety Department prior to April of 2021, prohibited physical contact between law enforcement vehicles,

motorcycles, and ATVs, the new more aggression policy clearly meant officers were authorized to use physical contact and excessive deadly force against motorcycle and ATV drivers. Such use of deadly force was malicious, wanton, oppressive and violative of the Fourth Amendment of the U.S. Constitution and 42 U.S.C. § 1983.

185.

The callous and malicious conduct of the Defendants is further illustrated by the fact of the pursuit, seizure, injury and death of Chaston Paul Talley did not occur during the regular course of business for the Crime Suppression Unit, but rather the entire incident was a staged political event designed to produce exclusive video footage for WSB-TV, which would be broadcast and presented to the public in a manner designed to show that the Defendants and other political actors were "tough on crime." The employees and news reporter for WSB-TV were even allowed to ride along with the Crime Suppression Unit. To use public funds in such a depraved manner that resulted in the death of an ATV driver was unwarranted, callous, and malicious.

186.

At all material times, TFC Kraeling did not have a reasonable fear of imminent bodily harm when he moved rapidly, abruptly, and intentionally towards Mr. Talley using the driver's side of his police vehicle as a battering ram crashing into the passenger side of the small dirt bike driven by Mr. Talley.

187.

Every reasonable officer would have known that using physical deadly force against a moving ATV in the form of a fast moving four-ton vehicle against a two-hundred-pound dirt bike is excessive, wanton, malicious, violative of the Fourth Amendment, and would result in the immediate physical injury and/or death to Chaston Paul Talley.

188.

To further add to the malicious and wanton nature of the acts and conduct of the Defendants, immediately after the use of the excessive deadly force against Mr. Talley, the Defendants crafted, published, and released to the public a story designed to absolve Kraeling of any responsibility in this case. The Defendants concocted a story which concluded Chaston Paul Talley "on his own volition, ran into a tree." Such a story was untrue and directly relates to the guilty consciousness and maliciousness of the Defendants.

189.

In furtherance of their malicious conduct which demands the payment of punitive damages, Defendants completed a police report within hours of the excessive use of deadly force by Kraeling, announcing through their public relations partner WSB -TV, the discovery the Defendant had was outstanding warrants, giving the public the false impression officers were somehow aware of such alleged warrants while they pursued Mr. Talley. Despite this claim of information regarding Talley's background, the Defendants failed to provide any immediate information to the Atlanta Medical Center, the hospital which treated Mr. Talley with respect to his identity. Because of this intentional conduct by the defendants, the hospital admitted Talley under the name "Juniper Juniper," which through information and belief, may be regarded as a slang meaning of "tree."

190.

Because of the deliberate efforts of Defendants to conceal the identity of Mr. Talley, Mrs. Celeta Scott and her family were unable to locate her son for three days. The conduct of the Defendants was willful, malicious, and wanton, which caused Mrs. Scott and her family extreme pain and suffering and requires that Defendants pay punitive damages.

191.

Additionally, the Defendants intentionally, willfully, and maliciously mislead the DeKalb County Medical examiner with their account of how the injuries to Mr. Talley occurred. On about September 7, 2022, the Medical Examiner's Office was informed by the defendants that Mr. Talley's injuries occurred because he "loss control of his dirt bike and ran into a tree." After further investigation, the Medical Examiner, on March 14, 2023, took the extraordinary step of changing the official report on the death of Mr. Talley and stated the injuries he received came because of "contact" between Talley and Officer Kraeling.

192.

The investigator for the Dekalb Medical Examiner's Office stated to counsel for Plaintiff that the Defendants refused to turn over the video recordings of the incident and would only allow the medical examiner to view the recordings in the office of the Defendant.

193.

The changing of the Dekalb County Medical Examiner's Report to reflect the physical contact made in this case as opposed to the story of the voluntary loss of control by Mr. Talley concocted by defendants, is a clear indication that the conduct of the defendants was willful, malicious, and deliberate.

194.

As a direct and proximate result of the deliberate, willful, and malicious acts and conduct described herein, Mr. Talley suffered compensatory and special damages as defined under federal common law and in an amount to be determined by jury.

195.

Punitive damages are available to Plaintiff against Kraeling and the other Defendants and are hereby claimed as a matter of federal common law under *Smith v Wade,* 461 U.S. 30 (1983).

## Count IX – Attorney's Fees

*Plaintiff v. All Defendants, in Their Official Capacities*

196.

Plaintiff incorporates and re-alleges all preceding paragraphs as thoughtfully pleaded herein.

197.

Plaintiff is entitled to attorney's fees pursuant to 42 U.S.C. § 1988.

## Prayer for Relief

WHEREFORE, Plaintiff Celesta Scott, as the Administrator of the Estate of Chaston Paul Talley, prays for judgement against Defendants as follows:

1. As to Count I, a money judgement against Defendant Georgia Department of Public Safety for compensatory, special, and punitive damages together with costs and disbursements, including reasonable attorney's fees, for violations of the Georgia Tort Claims Act.

2. As to Count II, a money judgement against Defendants Kraeling, Chapeau and Wright for compensatory, special, and punitive damages together with costs and disbursements for violations of the Georgia Tort Claims Act.

3. As to Count III, a money judgement against Defendant Georgia Department of Public Safety for compensatory, special, and punitive damages together with costs and disbursements, including reasonable attorney's fees, for violating 42 U.S.C. § 1983.

4. As to Count IV, a money judgement against Defendants Kraeling, Chapeau, and Wright for compensatory, special, and punitive damages together with costs and disbursements for violating 42 U.S.C. §1983.

5. As to Count V, a money judgement against all the Defendants for compensatory, special, and punitive damages together with costs and disbursements for the Wrongful Death of Chaston Paul Talley under Georgia and Federal Law.

6. As to Count VI, a money Judgement against all the defendants for compensatory, special, and punitive damages together with costs and disbursements, for Intentional Infliction of Emotional Distress under Georgia and Federal Law.

7. As to Count VII, a money Judgement against all defendants for compensatory, special, and punitive damages together with costs and disbursements, for Failure to Maintain Physical Evidence

8. As to Count VIII, a money judgement against all defendants for compensatory, special, and punitive damages together with costs and disbursements, for Violating of O.C.G.A. 17-5-56 Failure to Maintain Physical Evidence under Georgia Law.

9. As to Count IX, a money judgement against all defendants for Attorney's Fees under Federal and Georgia Law.

10. For such other and further relief as this Court deems just and equitable.

Respectfully submitted, this day 5th of February 2026.

Paul L. Howard, Jr.
Georgia Bar No. 371088
*Counsel for Plaintiff*

**THE PAUL HOWARD LAW FIRM**
920 Dannon View SW, Suite 3202
Atlanta, Georgia 30331
Telephone: (404) 855-6263
Email: paul@thepaulhowardlawfirm.com